RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 19a0246p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

IN RE: APPLICATION TO OBTAIN DISCOVERY FOR USE IN
FOREIGN PROCEEDINGS.

—————————————————————————

ABDUL LATIF JAMEEL TRANSPORTATION COMPANY
LIMITED,

　　　　　　　　　　　　　　*Movant-Appellant*,

　　　*v.*

FEDEX CORPORATION,

　　　　　　　　　　　　　　*Respondent-Appellee*.

> No. 19-5315

———————————

Appeal from the United States District Court for
the Western District of Tennessee at Memphis.
No. 2:18-mc-00021—Jon Phipps McCalla, District Judge.

Argued:  August 8, 2019

Decided and Filed:  September 19, 2019

Before:  COLE, Chief Judge; GRIFFIN and BUSH, Circuit Judges.

———————————

## COUNSEL

**ARGUED:**  David Livshiz, FRESHFIELDS BRUCKHAUS DERINGER, US LLP, New York, New York, for Appellant.  Daniel T. French, FEDERAL EXPRESS CORPORATION, Memphis, Tennessee, for Appellee.  **ON BRIEF:**  David Livshiz, Linda H. Martin, Paige von Mehren, FRESHFIELDS BRUCKHAUS DERINGER, US LLP, New York, New York, Shea Sisk Wellford, MARTIN, TATE, MORROW & MARSTON, P.C., Memphis, Tennessee, for Appellant.  Daniel T. French, Colleen Hitch Wilson, FEDERAL EXPRESS CORPORATION, Memphis, Tennessee, for Appellee.

---

**OPINION**

---

JOHN K. BUSH, Circuit Judge. Thomas Jefferson once counseled his nephew Peter Carr on how to think: "Fix reason firmly in her seat, and call to her tribunal every fact, every opinion."[1] This case calls upon us to do just that. We must decide whether Abdul Latif Jameel Transportation Company Limited ("ALJ"), a Saudi corporation, may rely on 28 U.S.C. § 1782(a) to discover facts from FedEx Corporation ("FedEx Corp."), a U.S.-based corporation, for use in a commercial arbitration pending in a foreign country. Under § 1782(a), a federal district court may order discovery "for use in a proceeding in a foreign or international tribunal" upon application by "any interested person." Jefferson used the word "tribunal" in a metaphorical sense to refer to the mind. We must decide whether Congress used the words "foreign or international tribunal" in a literal sense that includes the commercial arbitration involved here.

In its § 1782(a) discovery application, ALJ sought a subpoena for documents from FedEx Corp. and deposition testimony of a corporate representative of that company. ALJ alleges that FedEx Corp. was involved in contract negotiations and performance of two contracts between ALJ and FedEx International Incorporated ("FedEx International"), a subsidiary of FedEx Corp. Each contract became the subject of a commercial arbitration, one pending in Dubai in the United Arab Emirates ("UAE"), the other brought in the Kingdom of Saudi Arabia. As explained below, we only address the availability of discovery for the Dubai arbitration because the arbitration in Saudi Arabia was dismissed, rendering moot ALJ's application as it pertains to this latter proceeding.

The district court denied ALJ's application, holding that the phrase "foreign or international tribunal" in § 1782(a) did not encompass either of the two arbitrations. ALJ now appeals, arguing that the phrase "foreign or international tribunal" does include such proceedings and that ALJ's discovery request should be granted.

---

[1]Letter from Thomas Jefferson to Peter Carr (Aug. 10, 1787), *in* 12 *The Papers of Thomas Jefferson* 14, 15 (Julian P. Boyd ed., 1955).

The interpretive question is an issue of first impression in the Sixth Circuit, although the Supreme Court provided guidance for interpretation of § 1782(a) in *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004). Upon careful consideration of the statutory text, the meaning of that text based on common definitions and usage of the language at issue, as well as the statutory context and history of § 1782(a), we hold that this provision permits discovery for use in the private commercial arbitration at issue. Accordingly, we **REVERSE** the district court's denial of ALJ's application and **REMAND** for the district court to determine, in the first instance, whether the application should be granted under four discretionary factors the Supreme Court outlined in *Intel* to guide that determination.

## I. BACKGROUND

A.    The Dispute Between ALJ and FedEx International

This dispute over statutory linguistics arises from supply-chain logistics. In 2014, after a period of negotiations, FedEx International entered a "General Service Provider" ("GSP") contract with ALJ. Under that contract (which was amended in 2015), ALJ agreed to be FedEx International's delivery-services partner in Saudi Arabia, where ALJ is incorporated. By agreement of the parties, disputes relating to the GSP were to be arbitrated in Dubai under the rules of the Dubai International Financial Centre-London Court of International Arbitration ("DIFC-LCIA").

In 2016, FedEx International and ALJ entered another contract, the Domestic Service Agreement ("DSA"), under which FedEx International promised to provide ALJ with "certain support services." R. 3, PageID 38. Those parties also agreed to arbitrate disputes arising under the DSA in Saudi Arabia under the rules and laws of that country.

After FedEx International and ALJ signed the GSP contract but before they entered the DSA, FedEx Corp.—the parent of FedEx International and appellee in this case—acquired TNT Express N.V. ("TNT"), a competitor in the delivery-services market in Saudi Arabia. According to ALJ, it did not become aware of the acquisition until it was already *fait accompli*.

The parties disagree in part about the causes of the underlying dispute. ALJ suggests that FedEx Corp. was significantly involved in luring ALJ into a contractual relationship with FedEx International. ALJ also indicates that FedEx Corp. and FedEx International kept ALJ in the dark about the impending TNT acquisition. According to ALJ, when it learned of the TNT acquisition, FedEx Corp. and FedEx International misled ALJ to believe that the future of its contractual relationship with FedEx International was secure. ALJ contends that, for several weeks during the fall of 2017, FedEx International failed to provide ALJ with the support promised in the DSA. Then, "without warning," according to ALJ, FedEx International announced that it would not be renewing the GSP contract and that ALJ would have to bid against other potential contractors if it wanted to keep working with FedEx International. Appellant Br. at 10.

FedEx Corp. responds that ALJ's brief overstates, and makes false assertions about, FedEx Corp.'s involvement in the negotiations and communications between FedEx International and ALJ. Additionally, FedEx Corp. disagrees that FedEx International was at fault in causing the ALJ-FedEx International rift. According to FedEx Corp., the trouble between ALJ and FedEx International started when ALJ began providing unsatisfactory service; FedEx International sought to work with ALJ but eventually gave up and decided to open up ALJ's position as FedEx International's general service partner in Saudi Arabia to bidding among various applicants.

These factual disputes aside, ALJ and FedEx Corp. agree that attempts to reconcile soon broke down completely. On March 4, 2018, ALJ commenced arbitration against FedEx International (the "Saudi Arbitration") before a panel constituted under the rules and laws of Saudi Arabia, as provided in the DSA. A few weeks later, on March 21, FedEx International commenced arbitration against ALJ (the "DIFC-LCIA Arbitration") before a panel constituted under the rules of the DIFC-LCIA, as provided in the GSP contract.

The DIFC-LCIA Arbitration panel consists of three members appointed by the DIFC-LCIA Arbitration Centre. According to FedEx Corp., the DIFC-LCIA Arbitration Centre is a joint venture of the London Court of International Arbitration and the DIFC Arbitration

Institute.[2]  The DIFC Arbitration Institute, in turn, was established by statute in the emirate of Dubai.   Awards of the arbitral panel are reviewable by the DIFC Court, which was also established by statute in Dubai.   The DIFC Court reviews arbitral awards for procedural soundness under the DIFC Arbitration Law, which was promulgated by the Dubai government. In addition, if a party challenges an award alleging inconsistency with UAE public policy, the award is reviewed under the law of the UAE.  Aside from these review provisions, however, awards of the panel are binding on the parties.   A merits hearing in the pending DIFC-LCIA Arbitration between ALJ and FedEx International is currently scheduled for November 3–9, 2019.

As for the makeup and operations of the Saudi Arbitration panel, we do not go into details because on April 30, 2019 (shortly after ALJ filed this appeal), that panel issued an award dismissing ALJ's claims.  ALJ has challenged the dismissal and is awaiting a decision.  Below, in section II(A), we explain why the dismissal of the Saudi Arbitration has rendered moot the issues in this appeal as they pertain to that arbitration proceeding.

B.      Procedural History of ALJ's § 1782(a) Discovery Application

On May 14, 2018, ALJ filed an application for discovery under 28 U.S.C. § 1782(a) against FedEx Corp. in the United States District Court for the Western District of Tennessee, the federal district where FedEx Corp. is headquartered.   In the application, ALJ sought to compel production of documents from FedEx Corp. and to subpoena deposition testimony from a corporate representative of FedEx Corp.  Although FedEx Corp. was not a party to either of ALJ's contracts with FedEx International, ALJ sought, among many other pieces of information:

> 1.      All Documents and Communications concerning the negotiations of the Agreements between FedEx Corp. or FedEx International, on the one hand, and ALJ, on the other hand.
>
> 2.      All Documents or Communications concerning or reflecting (i) any representations, assertions or assurances provided by FedEx Corp. or FedEx International, or any agent thereof, to ALJ, or any agent thereof, concerning the length of the Agreements, or FedEx Corp. or FedEx International's intent to enter into a long-term business relationship with ALJ; and (ii) all any [sic] knowledge

---

[2]FedEx Corp. provided some of these details at oral argument, and they are undisputed.

or awareness on the part of FedEx Corp. or FedEx International of ALJ's need to make investments in connection with ALJ's agreed-upon provision of services to FedEx International.

R. 1-3, PageID 16.

The district court held a hearing on ALJ's application on July 17, 2018, and it denied the application in an order dated March 13, 2019. In its order, the district court determined that neither the Saudi Arbitration panel nor the DIFC-LCIA Arbitration panel constituted a "foreign or international tribunal" within the meaning of § 1782(a). Therefore, the district court held that ALJ could not, as a matter of law, obtain discovery for use in those proceedings under § 1782(a). The district court did not consider whether it would have exercised its discretion to grant ALJ's application under § 1782(a) had it determined that either arbitration panel was a "foreign or international tribunal."

ALJ timely filed a notice of appeal, and on April 12, 2019, it moved this court to expedite the appeal in light of the pending arbitration proceedings. On April 22, 2019, we ordered an expedited briefing and argument schedule.

## II.  DISCUSSION

A.          Whether the Saudi Arbitration Discovery Dispute is Justiciable

Before turning to the statutory interpretation inquiry, we must address a justiciability issue with regard to the Saudi Arbitration. As noted, that proceeding has been dismissed, and ALJ is appealing the dismissal. FedEx Corp. argues that because the Saudi Arbitration is no longer pending, it "is irrelevant to ALJ's § 1782 motion." Appellee Br. at 9–10. Therefore, FedEx Corp. focuses its substantive arguments on the DIFC-LCIA Arbitration only.

In response, ALJ argues that if we determine that the question regarding the Saudi Arbitration is moot and inappropriate for merits consideration, we should vacate the district court's denial of the § 1782(a) application with respect to that arbitration. ALJ worries that the Saudi Arbitration panel's dismissal may be reversed by a Saudi court and that if we do not bifurcate the district court's judgment and vacate as moot with respect to the Saudi Arbitration,

the district court's reasoning as to that proceeding will stand and will preclude ALJ from bringing a future application.

We agree that the dismissal of the Saudi Arbitration makes the interpretive question moot with respect to that arbitration. Therefore, it would be inappropriate for us to make a merits ruling on the question presented as it pertains to the Saudi Arbitration panel. *See Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992). But ALJ's preclusion fears are unfounded. ALJ brought one § 1782(a) application in the district court, relying on both the DIFC-LCIA Arbitration and the Saudi Arbitration as "foreign or international tribunal[s]" that would trigger the statute's applicability. And the district court entered one judgment rejecting both of ALJ's proffered reasons for needing discovery. Our conclusion that the DIFC-LCIA Arbitration panel is a "foreign or international tribunal" is sufficient for us to reverse that judgment and require the district court to consider ALJ's application anew. Therefore, we need not address the Saudi Arbitration, but the district court's judgment will not remain in place, so that judgment will not preclude a future application should ALJ want to bring one. *See Dodrill v. Ludt*, 764 F.2d 442, 444 (6th Cir. 1985) (noting that "the general rule is that a judgment which is vacated, *for whatever reason*, is deprived of its conclusive effect as collateral estoppel" as to all of the issues litigated and decided in the action (emphasis added) (citations omitted)); *see generally id.* at 444–45 (discussing and applying the rule).

B.      Whether the DIFC-LCIA Arbitration Panel is a "Foreign or International Tribunal"

We must now determine whether the DIFC-LCIA Arbitration panel qualifies as a § 1782(a) "foreign or international tribunal." Neither the phrase "foreign or international tribunal" nor the word "tribunal" is defined in the statute, and the parties dispute whether the word "tribunal" includes a privately contracted-for commercial arbitration. The district court concluded that it does not.

We review the district court's decision on a question of statutory interpretation—a legal question—de novo. *See United States v. Kassouf*, 144 F.3d 952, 955 (6th Cir. 1998). "In determining the meaning of a statutory provision, we look first to its language, giving the words used their ordinary meaning." *Artis v. District of Columbia*, 138 S. Ct. 594, 603 (2018) (citation

and internal quotation marks omitted). And ordinary meaning is to be determined retrospectively: we must go back to "the time Congress enacted the statute" and discern its meaning from that point in the past. *See New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019) (citations omitted); *see also Wisc. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2070 (2018).

Thus, we can sometimes determine the ordinary meaning of words in a statute by reference to dictionaries in use at the time the statute was enacted. *See Food Marketing Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2363–64 (2019). Here, the relevant language was added to § 1782(a) by amendment in 1964, *see Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 248–49 (2004), so we may consult dictionaries in use at that time. In addition, we may consult subsequently published dictionaries. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 419 ("Scalia & Garner, *Reading Law*") ("Dictionaries tend to lag behind linguistic realities . . . ."). However, we use later-published dictionaries carefully and would hesitate to rely upon definitions appearing *solely* in dictionaries published more than a decade or so after the statute's enactment.

We also may consider other evidence of usage in the years preceding the enactment: for example, the sense in which courts used a particular word or phrase. *See New Prime*, 139 S. Ct. at 540 (looking to early-20th-century cases' use of the term "contract of employment" as an aid to determining the meaning of that phrase in a 1925 statute); *see also Argus Leader Media*, 139 S. Ct. at 2363. As a respected treatise on statutory interpretation notes, the context of a statute's text includes "a word's historical associations acquired from recurrent patterns of past usage." Scalia & Garner, *Reading Law* 33.

Of course, linguistic meaning of words may not always equate to statutory meaning if the structure of the statute suggests something else. Words "must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989) (citation omitted); *see also Nat'l Air Traffic Controllers Ass'n v. Sec'y of Dep't of Transp.*, 654 F.3d 654, 657 (6th Cir. 2011) ("Plain meaning is examined by looking at the language and design of the statute as a whole." (citation omitted)). But if an examination of the

statute's text, context, and structure produces an answer to our interpretation question, we need inquire no further.  *See Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004).

Applying these principles here, we address the statute in which the operative language— "foreign or international tribunal"—appears.  Section 1782 provides:

> (a) The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in *a foreign or international tribunal*, including criminal investigations conducted before formal accusation.  The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court.  By virtue of his appointment, the person appointed has power to administer any necessary oath and take the testimony or statement.  The order may prescribe the practice and procedure, which may be in whole or part the practice and procedure of the foreign country or the international tribunal, for taking the testimony or statement or producing the document or other thing.  To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure.
>
> A person may not be compelled to give his testimony or statement or to produce a document or other thing in violation of any legally applicable privilege.
>
> (b) This chapter does not preclude a person within the United States from voluntarily giving his testimony or statement, or producing a document or other thing, for use in a proceeding in a foreign or international tribunal before any person and in any manner acceptable to him.

28 U.S.C. § 1782 (emphasis added).

As an initial matter, it is important to note that we have no evidence that the phrase "foreign tribunal" or the phrase "international tribunal" is a term of art.  We have located no dictionary that defines either phrase.[3]  *See New Prime*, 139 S. Ct. at 539 (noting that the absence of dictionary definitions for the term "contract of employment" in 1925 was "a first hint the phrase wasn't then a term of art bearing some specialized meaning").  And we have found no other evidence that either phrase is a term of art with a specialized meaning.

---

[3]We consulted *Merriam-Webster's Dictionary of Law* (1996); Bryan A. Garner, *A Dictionary of Modern Legal Usage* (2d ed. 1995); *Ballentine's Law Dictionary* (William S. Anderson ed., 3d ed. 1969); and *Black's Law Dictionary* (4th ed. 1957).

We note also that there is no dispute that the DIFC-LCIA arbitration is "foreign or international" in nature.[4]  Thus, we focus on the meaning of "tribunal," which is hotly disputed.[5]

1.      Dictionary Definitions

To determine the meaning of "tribunal," we turn first to dictionary definitions.  There is dictionary support for ascribing a meaning that includes private arbitral panels.  For example, several reputable legal dictionaries contain definitions of "tribunal" broad enough to include private arbitrations.  *See Merriam-Webster's Dictionary of Law* (1996) ("a court or forum of justice: a person or body of persons having to hear and decide disputes so as to bind the parties"); Bryan A. Garner, *A Dictionary of Modern Legal Usage* (2d ed. 1995) ("(1) 'a court or other adjudicatory body[]' . . . .  In its most usual application—sense (1)—*tribunal* is broader than *court* and generally refers to a body, other than a court, that exercises judicial functions . . . ."); *cf.* Max Radin, *Law Dictionary* (1955) ("A general word equivalent to court, but of more

---

[4]Furthermore, we have no reason to doubt that the phrase "foreign or international" has a broad meaning that, at minimum, encompasses a proceeding like the DIFC-LCIA Arbitration that is taking place abroad and is not subject to United States laws or rules.  For instance, consider the following definitions of "foreign": *Webster's New World College Dictionary* (3d ed. 1997) ("1. Situated outside one's own country, province, locality, etc. . . . .  4. Not subject to the laws or jurisdiction of the specified country."); *Merriam-Webster's Dictionary of Law* (1996) ("Not being within the jurisdiction of a political unit (as a state); *esp*: being from or in a state other than the one in which a matter is being considered . . . ."); *The Oxford English Dictionary* (2d ed. 1989) ("7. Situated outside the country; not in one's own land."); *Webster's Third New International Dictionary* (1961) ("1. Situated outside a place or country: as (a) situated outside one's own country . . . .  8.(a) not being within the sphere of operation of the laws of a country under consideration—opposed to *domestic* . . . ."); *cf. Ballentine's Law Dictionary* (3d ed. 1969) ("Belonging to another nation or country.").  And consider the following definitions of "international": *Webster's New World College Dictionary* (3d ed. 1997) ("4. Of, for, or by people in various nations."); *The Random House Dictionary of the English Language* (2d ed. unabridged 1987) ("2. Of or pertaining to two or more nations or their citizens . . . ."); *The American Heritage Dictionary of the English Language* (1969) ("Of, relating to, or involving two or more nations or nationalities . . . ."); *Ballentine's Law Dictionary* (William S. Anderson ed., 3d ed. 1969) ("A characterization in a general manner of business or transactions between nations or between persons of different nations."); *Webster's Third New International Dictionary* (1961) ("1. Existing between or among nations or their citizens . . . .").  Because the question is not before us, we need not decide whether the DIFC-LCIA Arbitration panel is most aptly described as only "foreign," only "international," or both.

[5]We would be remiss if we did not note that both parties *agree* that the meaning of "tribunal" in § 1782(a) is not limited to "court"—the narrower of the two definitions we will discuss.  Furthermore, the Supreme Court's decision in *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004), which we will also discuss later, applied the statute to a proceeding before a non-judicial entity.  The Supreme Court seems to have thus implicitly rejected the narrower definition of the word.  However, FedEx Corp. argues that the word is limited to government-sponsored entities and excludes private arbitration.  Thus, for the sake of thoroughness, we will explain in section II(B)(2) why American courts' use of the word indicates both that the broader definition applies and that the word includes private arbitral proceedings.  Below, in sections II(B)(4)(b) and II(B)(5)–(6), we will discuss FedEx Corp.'s counterarguments in detail.

extensive use in public and international law."). Other legal dictionaries contain narrower definitions. *See Black's Law Dictionary* (5th ed. 1979) ("The whole body of judges who compose a jurisdiction; a judicial court; the jurisdiction which the judges exercise . . . ."); *Ballentine's Law Dictionary* (William S. Anderson ed., 3d ed. 1969) ("A court. The seat or bench for the judge or judges of a court."); *Black's Law Dictionary* (4th ed. 1951) (same as 1979 edition).

Turning to non-legal sources, at least two widely used English dictionaries define "tribunal" broadly enough to include private arbitrations. *See Webster's Third New International Dictionary* (1966) ("2: a court or forum of justice: a person or body of persons having authority to hear and decide disputes so as to bind the disputants . . . ."); *Webster's New International Dictionary of the English Language* (2d ed. 1950) (same). On the other hand, some English dictionaries contain narrower definitions whose inclusiveness of private proceedings is more debatable. *See Random House Unabridged Dictionary* (2d ed. 1993) ("1. a court of justice. 2. a place or seat of judgment."); *American Heritage Dictionary of the English Language* (1976) ("1. a seat or court of justice."); *see also The Oxford English Dictionary* (2d ed. 1989) ("2.a. A court of justice; a judicial assembly . . . . c. Any of various local boards of officials empowered to settle disputes, esp. between an individual and a government department, to adjudicate on fair rents, exemption from military service, etc. . . . .").[6]

In sum, several legal and non-legal dictionaries contain definitions of "tribunal" broad enough to include private arbitration, while others contain narrower definitions that seem to exclude such proceedings. Because dictionaries leave room for interpretation, we turn to other indicators of usage to discern the word's linguistic meaning.

2.      Use of the Word "Tribunal" in Legal Writing

A broader definition of "tribunal" finds more support in American courts' historical and continuing usage of the word to describe private arbitrations. *Cf. New Prime*, 139 S. Ct. at 540 & nn.2–3 (reviewing American courts' prior usage of a phrase to determine the meaning of that

---

[6]*See also The Random House Dictionary of the English Language* (1973), *The Oxford English Dictionary* (1971), and *The American College Dictionary* (1970) (all giving similar definitions).

phrase in a statute).   American jurists and lawyers have long used the word "tribunal" in its broader sense: a sense that includes private, contracted-for, commercial arbitral panels.   For example, Justice Joseph Story's *Commentaries on Equity Jurisprudence* used the word "tribunal" to describe private, contracted-for arbitrations:

> Neither will [courts of equity] . . . compel arbitrators to make an award; nor, when they have made an award, will they compel them to disclose the grounds of their judgment.  The latter doctrine stands upon the same ground of public policy, as the others; that is to say, in the first instance, not to compel a resort to these domestic tribunals, and, on the other hand, not to disturb their decisions, when made, except upon very cogent reasons.

2 Joseph Story, *Commentaries on Equity Jurisprudence* § 1457 (6th ed. 1853) (footnotes omitted).

Furthermore, courts used the word to describe private, contracted-for commercial arbitrations for many years before Congress added the relevant language to § 1782(a) in 1964.  In *Henry v. Lehigh Valley Coal Co.*, 64 A. 635, 636 (Pa. 1906), for example, the Supreme Court of Pennsylvania described a panel of three engineers—to be chosen by a method prescribed by the parties' contract—as a "special tribunal to settle a special subject of dispute . . . , to wit, how much minable coal still remains unmined in the land."  Similarly, in *Eastern Engineering Co. v. Ocean City*, 167 A. 522, 523 (N.J. 1933), the Supreme Court of New Jersey stated: "The settlement of controversies by arbitration is an ancient practice at common law.  In its broad sense, it is a substitution, by consent of the parties, of another tribunal for the tribunal provided by the ordinary processes of law."  In *Susong v. Jack*, 48 Tenn. 415, 416–17 (1870), the Supreme Court of Tennessee held that if parties to litigation referred their case to arbitration, the litigation would be discontinued.  In so holding, the court stated that "it is the voluntary act of the parties in submitting their cause to another tribunal, that operates to discontinue" the pending court case.  *Id.*  The state-court reporters abound with other examples, some within a few years of the 1964 amendment that added the statutory language at issue.  *See, e.g.*, *Park Constr. Co. v. Indep. Sch. Dist.*, 296 N.W. 475, 477 (Minn. 1941); *United Ass'n of Journeymen & Apprentices of the Plumbing & Pipefitting Indus. of the U.S. & Can., Local Union 525, Las Vegas v. Stine*, 351 P.2d 965, 974 (Nev. 1960); *Astoria Med. Grp. v. Health Ins. Plan*, 182 N.E.2d 85, 87 (N.Y. 1962);

*Gilbert v. Burnstine*, 237 N.Y.S. 171, 178 (N.Y. Sup. Ct. 1929), *rev'd*, 174 N.E. 706 (N.Y. 1931); *Comm'rs v. Carey*, 1 Ohio St. 463, 468 (1853); *Green & Coates Sts. Passenger Ry. Co. v. Moore*, 64 Pa. 79, 91 (1870); *Giannopulos v. Pappas*, 15 P.2d 353, 356 (Utah 1932).

The Supreme Court of the United States, and our court, have used the same terminology. In *Toledo Steamship Co. v. Zenith Transportation Co.*, 184 F. 391, 400 (6th Cir. 1911), this court was addressing a private agreement to arbitrate when it stated that the "question [of fault] was settled against [the appellant] by his own tribunal." In *Bernhardt v. Polygraphic Co. of America*, 350 U.S. 198, 203 (1956), the Supreme Court observed: "The nature of the tribunal where suits are tried is an important part of the parcel of rights behind a cause of action. The change from a court of law to an arbitration panel may make a radical difference in ultimate result." *Bernhardt* involved a contract under which the parties agreed to resolve disputes by "arbitration under New York law by the American Arbitration Association;" thus, the case involved a private arbitration. *Id.* at 199. As another example, in a 1955 case, Justice Hugo Black referred to the question "whether a judicial rather than an arbitration tribunal shall hear and determine [an] accounting controversy." *Baltimore Contractors v. Bodinger*, 348 U.S. 176, 185 (1955) (Black, J., dissenting), *overruled by Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271 (1988). *Bodinger* involved a contract in which the parties to a joint venture agreed to refer disputes to one of two named private arbitrators "or an accountant or auditor named by either of them." *Id.* at 177. And in *Red Cross Line v. Atlantic Fruit Co.*, 264 U.S. 109, 121 n.1 (1924), the Supreme Court quoted an 1845 district court case that stated:

> Courts of equity do not refuse to interfere to compel a party specifically to perform an agreement to refer to arbitration[] because they wish to discourage arbitrations . . . . But when they are asked to . . . compel the parties to appoint arbitrators whose award shall be final, they necessarily pause to consider whether such tribunals possess adequate means of giving redress . . . .

*Id.* (quoting *Tobey v. Cty. of Bristol*, 23 F. Cas. 1313, 1320 (D. Mass. 1845)).[7]

---

[7]*See also, e.g., Am. Airlines, Inc. v. Louisville & Jefferson Cty. Air Bd.*, 269 F.2d 811, 816 (6th Cir. 1959); *Ky. River Mills v. Jackson*, 206 F.2d 111, 119 (6th Cir. 1953); *Wilko v. Swan*, 201 F.2d 439, 444 (2d Cir. 1952), *rev'd*, 346 U.S. 427 (1953).

More recently, the Supreme Court used the phrase "international arbitral tribunal" to describe a private arbitration. In *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*, 473 U.S. 614 (1985), the Court was addressing a proceeding in a private arbitral body, established pursuant to contract under the rules of the Japan Commercial Arbitration Association, when it stated: "To be sure, the international arbitral tribunal owes no prior allegiance to the legal norms of particular states . . . . The tribunal, however, is bound to effectuate the intentions of the parties." *Id.* at 636. Although *Mitsubishi* post-dates the 1964 amendment to § 1782(a) and is therefore less instructive than the earlier examples cited, it is nevertheless evidence of the common usage of the word "tribunal" to describe privately constituted arbitral bodies.

These sources show that American lawyers and judges have long understood, and still use, the word "tribunal" to encompass privately contracted-for arbitral bodies with the power to bind the contracting parties.

3.      Other Uses of the Word "Tribunal" in the Statute

Many of the foregoing dictionary definitions and the cited instances of longstanding usage support a linguistic definition of "tribunal" that includes a privately contracted-for arbitral body. But if the overall context and structure of the statute indicate that Congress used the word in a different sense than its linguistic meaning, the congressional meaning controls. *See Davis*, 489 U.S. at 809. Here, other evidence of congressional usage does not compel a narrower understanding of that word's meaning than its linguistic meaning.

"[I]dentical words used in different parts of the same statute are generally presumed to have the same meaning." *IBP, Inc. v. Alvarez*, 546 U.S. 21, 34 (2005) (citation omitted); *accord* Scalia & Garner, *Reading Law* 170; *see also United States v. Detroit Med. Ctr.*, 833 F.3d 671, 676 (6th Cir. 2016). Therefore, if other uses of the word "tribunal" appeared in contexts clearly demanding a more limited reading, we would consider whether the broad ordinary meaning of that word might not be the meaning in § 1782(a).

However, other uses of the word in the statute do not dictate a more limited reading. First, a sentence in § 1782(a) provides that "[t]he [discovery] order may prescribe the practice and procedure, which may be in whole or part the practice and procedure of the foreign country

or the international tribunal, for taking the testimony or statement or producing the document or other thing." Although the phrase "practice and procedure of the foreign country or the international tribunal" may appear to support FedEx Corp.'s position (which we will address below) that § 1782(a) applies only to governmental entities, that phrase is consistent with the statute's application to private arbitrations of the sort at issue here. The sentence's permissive wording—"may be in whole or part"—indicates that this is an optional borrowing provision: if the foreign country or international tribunal for use in which the district court is ordering discovery has procedures governing the taking of evidence that the district court finds would be helpful, then the district court may order that evidence be collected pursuant to those procedures. The most that could be said of the sentence is that it may be read to assume that a foreign country or international tribunal will have evidence-gathering procedures governing any given proceeding. But the statute's terms do not require that such procedures exist or that a "foreign tribunal" be a governmental entity of a country that has prescribed such procedures.

Title 28, Chapter 117 (which is entitled "Evidence; Depositions" and includes § 1782(a)) contains only one other instance of "tribunal," and that instance is not inconsistent with a definition of the word that includes private arbitrations.[8] Specifically, section 1781 addresses the transmittal of "a letter rogatory issued, or request made, by a foreign or international tribunal" to a "tribunal, officer, or agency in the United States." A private arbitral panel can make a request for evidence, so this section does not indicate that the word "tribunal" in the statute refers only to judicial or other public entities. Therefore, we see no reason to doubt our conclusion that the meaning of "tribunal" in § 1782(a) includes private arbitrations.

"[O]ur analysis begins with the language of the statute. And where the statutory language provides a clear answer, it ends there as well." *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999) (citations and internal quotation marks omitted). Here, the text, context, and structure of § 1782(a) provide no reason to doubt that the word "tribunal" includes private commercial arbitral panels established pursuant to contract and having the authority to

---

[8]As quoted in section II(B) above, subsection (b) of § 1782 also contains the phrase "foreign or international tribunal." However, it appears in the same context as subsection (a)'s use of the phrase, and we do not believe it holds any clues to that phrase's meaning in subsection (a).

issue decisions that bind the parties. Therefore, we need look no further to hold that the DIFC-LCIA Arbitration panel is a "foreign or international tribunal" and reverse the district court's judgment.

> 4.      The Supreme Court's Decision in *Intel*

Our holding finds support also in *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004). Although the Supreme Court has not addressed the particular question facing us here, its decision in *Intel* did address the scope of § 1782(a)'s use of "tribunal" in a different factual context. Both parties cite *Intel* in support of their respective positions on the statutory interpretation issue, so we will address whether the decision casts doubt on our textual conclusion. It does not. In fact, *Intel* determined that § 1782(a) provides for discovery assistance in non-judicial proceedings.

> a.      The Facts and Reasoning of *Intel*

*Intel* concerned an international antitrust enforcement complaint brought by Advanced Micro Devices, Inc. ("AMD") against Intel Corporation ("Intel") with the Directorate-General for Competition ("DG-Competition") of the Commission of the European Communities (the "Commission"). *Intel*, 542 U.S. at 246. The DG-Competition was the "primary antitrust law enforcer" of the European Union. *Id.* at 250. And the Commission was an "executive and administrative" body, *id.*, with the authority to "enforce the [Treaty Establishing European Community] with written, binding decisions, enforceable through fines and penalties," *id.* at 252 (citation omitted).

Antitrust proceedings in this system proceeded as follows. The DG-Competition would receive a complaint, which it would investigate. *Id.* at 254. If the DG-Competition decided to pursue the complaint, it would notify the investigation's target, which would then be subject to a hearing. *Id.* at 254–55. After the hearing, the officer who conducted the hearing would give the DG-Competition a report; the DG-Competition would provide a recommendation to the Commission on whether to dismiss the complaint or hold the target liable. *Id.* at 255. "The Commission's final action dismissing the complaint or holding the target liable [was] subject to review in the Court of First Instance and the European Court of Justice." *Id.*

In *Intel*, AMD filed a § 1782(a) application in federal district court to obtain evidence from Intel for use in the antitrust enforcement proceeding. *Id.* at 246. Relevant here, the Supreme Court had to ascertain whether the Commission was a "foreign or international tribunal" within the meaning of § 1782(a). *See id.* at 257. The Supreme Court concluded that it "ha[d] no warrant to exclude the . . . Commission, to the extent that it acts as a first-instance decisionmaker, from § 1782(a)'s ambit." *Id.* at 258.

In reaching that conclusion, the Court noted that the pre-1964 version of the statute had empowered district courts to order discovery "in any judicial proceeding pending in any court in a foreign country." *Id.* at 248 (emphasis omitted); *see id.* at 258. In 1964, Congress replaced that phrase with "in a proceeding in a foreign or international tribunal." *Id.* at 248–49, 258. According to the *Intel* Court, "Congress understood that change to 'provid[e] the possibility of U.S. judicial assistance in connection with [administrative and quasi-judicial proceedings abroad].'" *Id.* (alterations in original) (quoting S. Rep. No. 88–1580, at 7–8 (1964), *as reprinted in* 1964 U.S.C.C.A.N. 3782, 3788 ("Senate Report")). Thus, on the Supreme Court's reasoning, the word "tribunal" applies to non-judicial proceedings.

In further support of its conclusion that the Commission was a "tribunal," the Supreme Court quoted a law review article by a professor who had participated in drafting the 1964 amendments:

> "[T]he term 'tribunal' . . . includes investigating magistrates, administrative and *arbitral tribunals*, and quasi-judicial agencies, as well as conventional civil, commercial, criminal, and administrative courts"; in addition to affording assistance in cases before the European Court of Justice, § 1782, as revised in 1964, "permits the rendition of proper aid in proceedings before the [European] Commission in which the Commission exercises quasi-judicial powers."

*Id.* (second and third alterations in original) (emphasis added) (quoting Hans Smit, *International Litigation Under the United States Code*, 65 Colum. L. Rev. 1015, 1026–27 & nn.71, 73 (1965)). Finally, the Supreme Court quoted an amicus brief from the Commission that explained how the Commission's "investigative function blur[red] into decisionmaking" when it decided what action to take pursuant to the DG-Competition's report. *Id.* (citation omitted).

As the foregoing shows, the Supreme Court seems to have primarily focused on the decision-making power of the Commission—and Congress's substitution in 1964 of the broad phrase "foreign or international tribunal" for the specific phrase "judicial proceeding in a foreign country"—in reaching its conclusion that the Commission was a "tribunal." In explaining its reasoning, the *Intel* Court said nothing that would make us doubt the outcome of our textual analysis in this case.[9] FedEx Corp. disagrees, however, so next we will address its reading of *Intel*.

b.        Whether *Intel* Limits § 1782(a) to "State-Sponsored" Arbitrations

Not disputing that some arbitrations fall within the statute's use of "tribunal," FedEx Corp. argues that only a certain type of arbitration qualifies: namely, "state-sponsored" arbitration. Appellee Br. at 24. By "state-sponsored," FedEx Corp. appears to refer to arbitral authorities permanently maintained by a national or international government to deal with certain categories of disputes, as opposed to arbitral authorities constituted pursuant to a contract between private parties to deal with particular commercial disputes as they arise.

FedEx Corp. does not provide any examples of "state-sponsored" arbitral bodies that would fit its reading of the statute. Instead, FedEx Corp. cites a line from the section of *Intel* describing four discretionary factors district courts should consider in deciding whether to grant a § 1782(a) request. The second factor in the analysis is "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance." *Intel*, 542 U.S. at 264. Because a private arbitration panel "is not a 'foreign government' nor a 'court' nor an 'agency,'"

---

[9]ALJ emphasizes the *Intel* Court's quotation from the Smit law review article, with its inclusion of "arbitral tribunals," as evidence that private arbitrations are included in the meaning of "tribunal." FedEx Corp. responds that (1) this portion of the Smit quotation was dicta and should be accorded minimal weight and (2) "arbitral tribunals" does not necessarily refer to *private* arbitral panels. Even granting that FedEx Corp.'s arguments have some merit, the Supreme Court's approving quotation of the Smit article certainly provides no affirmative support for FedEx Corp.'s reading of the statute. Furthermore, our conclusion about the guidance to be derived from *Intel* would be the same absent the Smit article's mention of "arbitral tribunals." The characteristics of the Commission mentioned by the *Intel* Court in reaching its conclusion support our conclusion here that the arbitration at issue is a "tribunal," *see Intel*, 542 U.S. at 258: the DIFC-LCIA panel is a "first-instance decisionmaker" with the power to bind the parties—an exercise of "quasi-judicial powers," *see id.* at 257 (citation omitted).

FedEx Corp. argues, it "is not within the class of tribunals contemplated in *Intel*." Appellee Br. at 25.

When viewed in context, however, this sentence from *Intel* does not do the work FedEx Corp. asks of it. First, and most saliently, this portion of the *Intel* opinion simply describes one factor for district courts to consider when deciding whether to grant a § 1782(a) request *after* making the threshold determination of whether a given proceeding is in a "tribunal." Nothing in the quoted sentence indicates that the *Intel* Court was attempting to define "tribunal" in this portion of the opinion.

Second, the quoted sentence does not foreclose the possibility that a district court might consider the privately constituted "nature" of a "tribunal" to counsel against granting discovery in a given case—for instance, if an arbitral panel has limited resources to consider outside evidence (a factual determination that the district court would be in a better position than an appellate court to make). Indeed, that the Court made "the nature of the foreign tribunal" a factor for the district court to consider suggests that the Court was not attempting to contemplate any and all possible types of "tribunal" in which § 1782(a) discovery might be granted. As the Court noted, "[i]n light of the variety of foreign proceedings resistant to ready classification in domestic terms, Congress left unbounded by categorical rules the determination whether a matter is proceeding 'in a foreign or international tribunal.'" *Intel*, 542 U.S. at 263 n.15.

In conclusion, *Intel* contains no limiting principle suggesting that the ordinary meaning of "tribunal" does not apply here. FedEx Corp., however, argues that such a principle may be found in the legislative history of § 1782(a) and in policy considerations, and it directs our attention to two of our sister circuits' decisions that relied on those sources. To those decisions we now turn.

5.      The Second Circuit and Fifth Circuit Decisions

Both parties have spent extensive resources briefing and arguing non-textual arguments, and we recognize that our decision today is at odds with two other circuits' decisions on this issue. *See Republic of Kazakhstan v. Biedermann Int'l*, 168 F.3d 880, 883 (5th Cir. 1999) ("*Biedermann*"); *National Broadcasting Co., Inc. v. Bear Stearns & Co., Inc.*, 165 F.3d 184 (2d

Cir. 1999) ("*NBC*"). Therefore, we will explain why the counterarguments do not dissuade us from our conclusion.

FedEx Corp. relies on *NBC* and *Biedermann* to support its argument that only "state-sponsored" proceedings fall within § 1782(a)'s scope. In those decisions, the Second and Fifth Circuits, respectively, determined that the word "tribunal" in § 1782(a) does not clearly exclude private arbitrations but that the scope of the word is ambiguous. *See Biedermann*, 168 F.3d at 881; *NBC*, 165 F.3d at 188. After considering the legislative history of § 1782(a) as well as policy considerations, the Second and Fifth Circuits concluded that "tribunal" includes only "governmental or intergovernmental arbitral tribunals and conventional courts and other state-sponsored adjudicatory bodies." *NBC*, 165 F.3d at 190; *see Biedermann*, 168 F.3d at 882.

Although the word "tribunal" has a broad definition and a narrow definition in dictionaries, we do not agree that legislative history is required to resolve the scope of the word in § 1782(a). First, we believe the Second and Fifth Circuits turned to legislative history too early in the interpretation process. The *NBC* court turned to legislative history after determining that the definition of "tribunal" *is* broad enough to include private arbitrations. *See NBC*, 165 F.3d at 188; *see also Biedermann*, 168 F.3d at 881 (agreeing with the Second Circuit that the phrase "'foreign or international tribunal' is ambiguous" and relying on the history and apparent purpose of the statute to determine the meaning of that phrase). By contrast, we agree that dictionary definitions *alone* do not necessarily produce the conclusion that "tribunal" extends to the proceeding at issue here; however, courts' longstanding usage of the word shows not only that one permissible meaning of "tribunal" includes private arbitrations but also that that meaning is the best reading of the word in this context. Thus, it is not necessary or appropriate to consult extra-textual sources of information. *See Lamie*, 540 U.S. at 539.

Second, some scholars and judges have questioned the reliability of legislative history as an indicator of statutory meaning. *See generally* Scalia & Garner, *Reading Law* 369–90. For example, some scholars and judges have noted that comments on a statute's meaning in congressional reports do not undergo the rigorous process of political horse-trading, bicameralism, and presentment; thus, these commentators have argued, those comments are not

an appropriate guide to the meaning of text that did go through that process. *See, e.g.*, John F. Manning, *Textualism as a Nondelegation Doctrine*, 97 Colum. L. Rev. 673, 728 (1997). A related concern is that, even assuming a court may properly consider the subjective intentions of those who voted on a bill, reliance on particular legislators' comments in congressional reports runs into a potential empirical pitfall: those comments may fail accurately to reflect the subjective intentions of a majority of lawmakers. *See, e.g.*, Frank H. Easterbrook, *The Role of Original Intent in Statutory Construction*, 11 Harv. J.L. & Pub. Pol'y 59, 59 (1988); *see also* Scalia & Garner, *Reading Law* 376.

Assuming that legislative history is a helpful aid in some cases, however, we do not find that it contradicts our conclusion here. In *NBC*, the Second Circuit relied largely on two facts from the legislative history of § 1782(a) to reach its conclusion that the provision applies only to government-run proceedings.[10] First, the court pointed out that although House and Senate reports accompanying the 1964 amendments spoke of a desire to expand discovery assistance beyond judicial proceedings, there was no mention of "private dispute resolution proceedings such as arbitration" in those reports. *NBC*, 165 F.3d at 189. Instead, the reports made statements such as, "[t]he word 'tribunal' is used to make it clear that assistance is not confined to proceedings before conventional courts." *Id.* (alteration in original) (quoting Senate Report at 3788; H.R. Rep. No. 88–1052, at 9 (1963) ("House Report")). In addition, the *NBC* court relied on the reports' statement that "[f]or example, it is intended that the court have discretion to grant assistance when proceedings are pending before investigating magistrates in foreign countries." *Id.* (alteration in original) (quoting Senate Report at 3788; House Report at 9).

The *NBC* court also discussed a second aspect of § 1782(a)'s lineage: a discovery-enabling statute that preceded and was replaced by § 1782(a). This statute, codified before its repeal at 22 U.S.C. §§ 270–270g, provided for discovery assistance in proceedings "before an international tribunal or commission, established pursuant to an agreement between the United States and any foreign government or governments." *NBC*, 165 F.3d at 192 (quoting repealed

---

[10]The Fifth Circuit's opinion in *Biedermann* also discussed § 1782(a)'s legislative history. We will not separately discuss that opinion's treatment of the legislative history because the arguments substantially duplicate those in *NBC*.

22 U.S.C. § 270). Observing that this statute used the phrase "international tribunal," the *NBC* court stated that "[t]here is no question that the statute applied only to intergovernmental tribunals" and that the purpose of the 1964 amendments was "to broaden the scope of the repealed 22 U.S.C. §§ 270–270g by extending the reach of the surviving statute to intergovernmental tribunals not involving the United States," not to extend discovery assistance to private arbitrations. *Id.* at 189, 190. *NBC* stated, and FedEx Corp. echoes, that "[t]he legislative history's silence with respect to private tribunals is especially telling because . . . a significant congressional expansion of American judicial assistance to international arbitral panels created exclusively by private parties would not have been lightly undertaken by Congress without at least a mention of this legislative intention." *Id.* at 190 (footnote omitted).

We are unpersuaded. Even if we were inclined to permit statements in congressional reports to color our view of a statutory term, we would hesitate to rely upon such statements as did *NBC*. Those statements do not exclude privately constituted proceedings from the meaning of "tribunal." If anything, what the statements make clear is Congress's intent to *expand* § 1782(a)'s applicability. Although FedEx Corp. argues that "there is nothing in the legislative history suggesting the expansion extended to private arbitration," Appellee Br. at 18, this argument fails to appreciate that the legislative history does not indicate that the expansion *stopped short* of private arbitration. The facts on which the legislative history is most clear are that the substitution of "tribunal" for "judicial proceeding" broadened the scope of the statute, and the repeal of §§ 270–270g removed the requirement that the United States be a party to an international agreement under which a proceeding takes place. Further inferences from the legislative history must rely on speculation.

For the above reasons, we discern no tension between § 1782(a)'s legislative history and our textual conclusion regarding the scope of the word "tribunal."

6.     Policy Considerations

Finally, FedEx Corp. draws our attention to some national policies that it says would be hampered by a reading of "tribunal" that includes private arbitrations. Although FedEx Corp. may be correct in its assessment of some of the interests at stake in extending discovery

assistance to private arbitral bodies, "[a]chieving a better policy outcome . . . is a task for Congress, not the courts." *See Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 13–14 (2000) (citations omitted). For us, "[i]t suffices that the natural reading of the text produces the result we announce." *Id.* at 13. But even if we were inclined to countenance policy arguments, we would not agree that they crown FedEx Corp.'s reading of § 1782(a) the correct one.

        a.        Breadth of § 1782(a) Discovery Compared to Federal Arbitration Act Discovery

FedEx Corp. argues that § 1782(a) provides broader discovery than is available to parties in domestic arbitration under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.* It would be incongruous, according to FedEx Corp., to permit foreign parties in arbitration overseas broader discovery than United States parties in arbitration here. In support, FedEx Corp. cites *Biedermann*, where the Fifth Circuit determined that differences between the FAA and § 1782(a) suggested that § 1782(a) should not apply to private arbitration. *See Biedermann*, 168 F.3d at 882–83. For example, the *Biedermann* court noted that § 1782(a) permits "any interested party" to seek a discovery order from a district court; by contrast, the FAA states only that arbitration panels themselves may order production of witnesses or documents and seek enforcement of those orders in federal district court. *See Biedermann*, 168 F.3d at 883; *see also NBC*, 165 F.3d at 187 (citing 9 U.S.C. § 7).

These concerns fail to persuade us. As ALJ points out, *Intel*—which was decided after *NBC* and *Biedermann*—rejected similar proportionality arguments about the breadth of discovery assistance provided by § 1782(a). *See Intel*, 542 U.S. at 260–63. The petitioner, Intel, asked the Supreme Court to rule that district courts must not order discovery under § 1782(a) unless the applicant demonstrates that the same discovery would be available under the rules of the foreign jurisdiction. *See id.* at 260–61. After determining that the text and history of § 1782(a) failed to support a "foreign-discoverability" requirement, the Supreme Court addressed Intel's argument that imposing such a requirement would serve the policy of "maintaining parity between litigants":

While comity and parity concerns may be important as touchstones for a district court's exercise of discretion in particular cases, they do not permit our insertion of a generally applicable foreign-discoverability rule into the text of § 1782(a).

. . . .

. . . When information is sought by an "interested person," a district court could condition relief upon that person's reciprocal exchange of information. Moreover, the foreign tribunal can place conditions on its acceptance of the information to maintain whatever measure of parity it concludes is appropriate.

*We also reject Intel's suggestion that a § 1782(a) applicant must show that United States law would allow discovery in domestic litigation analogous to the foreign proceeding.* Section 1782 is a provision for assistance to tribunals abroad. It does not direct United States courts to engage in comparative analysis to determine whether analogous proceedings exist here.

*Id.* at 261–63 (emphasis added) (internal citations omitted).

The *Intel* Court also addressed a similar contention from Justice Breyer's dissent, which argued for limiting § 1782(a) to situations in which the party seeking discovery could obtain similar discovery either under foreign law or under domestic law "in analogous circumstances." *Id.* at 270 (Breyer, J., dissenting). The majority responded, "While we reject the rules the dissent would inject into the statute, we do suggest guides for the exercise of district-court discretion [in deciding whether to grant a particular discovery application]." *Id.* at 263 n.15 (internal citations omitted). Later, in detailing the four discretionary factors, the Court stated:

[T]he grounds Intel urged for categorical limitations on § 1782(a)'s scope may be relevant in determining whether a discovery order should be granted in a particular case. Specifically, a district court could consider whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country *or the United States*.

*Id.* at 264–65 (emphasis added) (internal citations omitted). Applying *Intel*'s reasoning, we decline to conclude that simply because similar discovery devices may not be available in domestic private arbitration, § 1782(a) categorically does not apply to foreign or international private arbitration.

b.          Efficiency Considerations

Next, FedEx Corp. contends that we should not read § 1782(a) as authorizing discovery in private commercial arbitrations because doing so would defeat a principal purpose of arbitrating disputes: namely, saving the parties expenditures of money and time associated with civil litigation. *See Biedermann*, 168 F.3d at 883; *see also NBC*, 165 F.3d at 190–91.

This argument is not persuasive. As *Intel* explained, a district court can limit or reject "unduly intrusive or burdensome" discovery requests. *Intel*, 542 U.S. at 265. FedEx Corp.'s argument seems to assume that § 1782(a) discovery requests will inevitably become unduly burdensome, but the Supreme Court has made clear that district courts enjoy substantial discretion to shape discovery under § 1782(a). *See id.* at 261, 262, 265; *see also Heraeus Kulzer, GmbH v. Biomet, Inc.*, 633 F.3d 591, 597–98 (7th Cir. 2011). As the Court has stated, a district court evaluating a § 1782(a) request may consider (among other factors) "the nature of the foreign tribunal" and "the character of the proceedings" for which discovery is sought. *Intel*, 542 U.S. at 264. The district court may well conclude, in some cases, that discovery of a scope appropriate for civil litigation would be "unduly intrusive or burdensome" in the context of an arbitration. And the district court may withhold or shape discovery assistance accordingly.

c.          The "Twin Aims" of § 1782

Finally, FedEx Corp. argues that providing § 1782(a) discovery assistance to participants in arbitration would not serve the "twin aims" of § 1782: "providing efficient assistance to participants in international litigation and encouraging foreign countries by example to provide similar assistance to our courts." Appellee Br. at 20 (quoting *JSC MCC Eurochem v. Chauhan*, No. 18-5890, 2018 U.S. App. LEXIS 26226, at *5 (6th Cir. Sept. 14, 2018) (order)). Assuming for the sake of argument that these purposes indeed provided Congress's primary motivation to pass, and later amend, § 1782(a), we would not conclude that arbitration is *outside* the reach of the statute simply because providing discovery assistance for use in arbitration might serve those purposes less directly than providing assistance for use in litigation. But FedEx Corp. suggests that permitting § 1782(a) discovery in arbitrations actually disserves United States interests because it "encourage[s] foreign countries to undermine U.S. policy in favor of enforcing private

arbitration agreements by granting discovery inconsistent with those agreements."  Appellant Br. at 20.

If FedEx Corp.'s point is that parties who agree to arbitrate disputes generally want to avoid extensive discovery, we would again note that § 1782(a) is permissive: the district court "may" order discovery, and the Supreme Court has made clear that the district court has wide discretion in determining whether and how to do so.  *See Intel*, 542 U.S. at 261, 262, 265, 266.  This discretion presumably extends to consideration of any agreements between the contracting parties regarding the availability and scope of discovery in arbitration.  *Cf. id.* at 266 n.19 ("The District Court might also consider the significance of the protective order entered by the District Court for the Northern District of Alabama [in related domestic litigation between AMD and Intel].").

To sum up, none of the policy arguments urged by FedEx Corp. affect our conclusion that the word "tribunal" in § 1782(a) encompasses private, contracted-for commercial arbitrations of the type at issue here.[11]  We hold that the DIFC-LCIA Arbitration panel is a "foreign or international tribunal," and the district court may order § 1782(a) discovery for use in the proceeding before that panel.

---

[11]FedEx Corp. also argues that even if we find private arbitrations are not categorically excluded from § 1782(a), we should apply a four-element "functional" analysis derived from *Intel* and employed by several district courts, including the court in this case.  The only element of that functional test that is disputed here would require a non-judicial adjudicator's decisions to be subject to judicial review if it is to be considered a "tribunal."  FedEx Corp. contends that the DIFC-LCIA Arbitration panel's decisions are not subject to judicial review, and therefore that panel is not a "tribunal."  But we are not convinced that *Intel* spawned a functional test or that, if it did, that test includes judicial reviewability.  The opinion does not purport to establish a test for future cases; more specifically, *Intel* does not say that a non-judicial "tribunal" must be subject to judicial review.  Although the Ninth Circuit had characterized the proceeding before the Commission as, "at minimum, one leading to quasi-judicial proceedings," *Intel*, 542 U.S. at 252 (quoting *Advanced Micro Devices, Inc. v. Intel Corp.*, 292 F.3d 664, 667 (9th Cir. 2002), *aff'd*, 542 U.S. 241 (2004)), the Supreme Court's own analysis focused more on the Commission's power "as a first-instance decisionmaker," *id.* at 258.

Even assuming that judicial reviewability is required, the DIFC-LCIA Arbitration easily passes that test.  Chapter 7 of the DIFC Arbitration Law sets out several grounds on which a party may challenge an award; in addition, the Arbitration Law provides that the DIFC Court may set aside an award if it involves a subject matter not capable of resolution by arbitration under the Arbitration Law, if it is "expressly referred" to a different entity for resolution, or if it conflicts "with the public policy of the UAE."  R. 41-1, PageID 1079–80.  Indeed, the grounds for setting aside an arbitral award under the FAA are similar to the grounds for doing so under the DIFC Arbitration Law.  *See* 9 U.S.C. § 10.  And review of awards under the FAA is considered "judicial review."  *See Hall Street Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 585 (2008).

C.      Whether ALJ is Entitled to § 1782(a) Assistance Under *Intel*

Next, ALJ asks us to rule that it is entitled to the discovery requested in its application. In *Intel*, the Supreme Court discussed four factors for district courts to consider in deciding whether to grant a § 1782(a) request:

> First, when the person from whom discovery is sought is a participant in the foreign proceeding . . . , the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad. . . . .
>
> Second, . . . a court . . . may take into account the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance . . . . [Third], a district court could consider whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States. [Fourth], unduly intrusive or burdensome requests may be rejected or trimmed.

542 U.S. at 264–65 (internal citations omitted). The district court in this case did not address the *Intel* factors because doing so was unnecessary after the court concluded that § 1782(a) did not apply to the arbitrations at issue.

We decline to analyze the *Intel* factors in the first instance. "It is the general rule that a federal appellate court does not consider an issue not passed upon below." *Jackson v. City of Cleveland*, 925 F.3d 793, 812 (6th Cir. 2019) (citation omitted). Although we sometimes make an exception if "the issue is presented with sufficient clarity and completeness and its resolution will materially advance the progress of . . . already protracted litigation," *id.* at 812–13 (citation omitted), the general rule carries particular force here. As the Supreme Court has made clear, whether to grant § 1782(a) discovery is a discretionary decision: "a district court is not required to grant a § 1782 discovery application simply because it has the authority to do so." *Intel*, 542 U.S. at 264 (citation omitted). The *Intel* factors, which guide that discretionary decision, require careful consideration of the facts and circumstances of the case.

Some of the relevant facts and circumstances are not fully presented in the appellate record here and, even if they were, require judgment calls that a trial court is better positioned than an appellate court to make. For instance, the fourth *Intel* factor involves consideration of

whether a discovery request is "unduly intrusive or burdensome;" if a request is overly broad, the district court may decide either to deny the request or to narrow it. *See id.* at 262 (noting how a district court may tailor discovery to serve the goal of "maintaining parity among adversaries"). In sum, the question of what outcome is appropriate under the *Intel* factors is not "presented with sufficient clarity and completeness" for us to consider it in the first instance. *Jackson*, 925 F.3d at 812–13 (citation omitted); *see also Mees v. Buiter*, 793 F.3d 291, 301 (2d Cir. 2015) (declining to "decide the [§ 1782(a)] application" in the first instance).

## III.  CONCLUSION

For the foregoing reasons, we **REVERSE** the district court's order and **REMAND** for the district court to consider whether ALJ's application should be granted under the *Intel* factors.